**Not for Publication**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

        *Plaintiff*,

   v.

REGINALD WARE.,

        *Defendant*.

Crim. No. 11-224

**OPINION**

**John Michael Vazquez, U.S.D.J.**

      This matter comes before the Court by way of Defendant Reginald Ware's motion to modify his sentence and for immediate compassionate release. D.E. 37. Ware filed his original motion *pro se*, but counsel thereafter filed a supplemental motion on his behalf. D.E. 40. The Government filed opposition, D.E. 41, to which Ware replied, D.E. 42. Defendant then submitted additional letters in support of his motion. D.E. 43, 44. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). Defendant seeks immediate release due to the ongoing COVID-19 pandemic. For the following reasons, Defendant's motion is denied.

---

[1] Defendant's *pro se* brief in support of his motion is referred to as "Br." (D.E. 37); Defendant's supplemental brief is referred to as "Supp. Br." (D.E. 40); the Government's opposition brief is referred to as "Opp." (D.E. 41); and Defendant's reply brief is referred to as "Reply" (D.E. 42).

## I. BACKGROUND

### A. Underlying Criminal Proceeding

On April 11, 2011, Ware was indicted on seven counts: Count One – conspiracy to commit a Hobbs Act robbery in violation of 18 U.S.C. § 1951(a); Counts Two through Five – Hobbs Act robberies in violation of 18 U.S.C. § 1951(a); Count Six – possession, use, and carrying of a firearm for a violent crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and Count Seven – carjacking in violation 18 U.S.C. § 2119(1). D.E. 7. The Government and Ware then entered into a written plea agreement, in which Ware agreed to plead guilty to Counts One, Six, and Seven. D.E. 15. As to Count Six, the plea agreement acknowledged that the violation of 18 U.S.C. § 924(c)(1)(A)(ii) carried a statutory minimum sentence of seven years that ran consecutively to any sentence imposed on Counts One and Seven. *Id.* at 2. The parties also agreed to certain stipulations, which were not binding on the Court. *Id.* at 7-9. Ware then pled guilty on July 6, 2011. D.E. 13.

Ware was thereafter sentenced on March 20, 2012. D.E. 19. Judge Walls sentenced Ware consistent with the stipulations in the plea agreement. Specifically, Judge Walls sentenced Ware to a term of 180 months imprisonment, consisting of 96 months on each of Counts One and Seven to run concurrently, and 84 months on Count Six, to run consecutive to the 96 months. D.E. 20. This lengthy sentence nevertheless reflected a substantial variance from the United States Sentencing Guidelines range that Ware faced; his Guideline range was 262 to 327 months. PSR ¶ 223.

Ware is currently housed at FCI Schuylkill in Pennsylvania. He began serving his sentence on April 3, 2012. Ware is currently scheduled to be released on December 17, 2023.

Ware's convictions stemmed from a literal crime spree. On July 27, 2020, Ware and a co-defendant entered a pharmacy in Jersey City, New Jersey with guns drawn. PSR ¶ 223. Ware and his companion threatened to kill the pharmacy's occupants if they moved and grabbed a female employee by the neck. *Id.* ¶¶ 13-16. Ware and the co-defendant made off with over 5,000 prescription pills (including oxycodone, oxymorphone, hydrocodone, and hydromorphone) as well as over $11,000 in cash and merchandise. *Id.* ¶ 18. Ware then engaged in robbing three additional pharmacies using similar tactics (guns drawn, threats, physical violence) on August 4, 2010, October 14, 2010, and October 16, 2010. *Id.* ¶¶ 19-22, 26-37. In each instance, Ware and his cohort took prescription medication (including opioid-based medication) as well as cash or merchandise. *Id.* Ware also committed a carjacking on October 12, 2010 in Jersey City. *Id.* ¶¶ 23-25. Ware and another man robbed a taxi driver at gunpoint, taking the vehicle, cash, and a cell phone. *Id.* The stolen prescription medication was apparently later sold by Ware and his confederate for cash.

### B. COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." *Coronavirus Disease 2019 (COVID-19)*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Aug. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/overview/index.html#background. "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to

3

critical (including respiratory failure and death). *Id.* Currently, there is no known cure for COVID-19. As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *Coronavirus Disease 2019 (COVID-19)*, "Older Adults," Centers for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id.* Those eighty-five or older are at greatest risk. *Id.*

The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary diseases, heart conditions such as coronary artery disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. *Coronavirus Disease 2019 (COVID-19)*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immunocompromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. *Id.*

Finally, racial and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. *Coronavirus Disease 2019 (COVID-19)*, "Health Equity Considerations and Racial and Ethnic Minority Groups," Centers for Disease Control and Prevention (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html. Factors to be considered are discrimination; healthcare access and utilization; occupation; educational, income, and wealth gaps; and housing. *Id.*

As of November 11, 2020, the United States had 10,170,846 COVID-19 cases, which resulted in 239,590 deaths. *CDC COVID Data Tracker*, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Nov. 11, 2020).

### 1. Federal Bureau of Prisons

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action Plan." *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.* Contractors who enter any BOP facility are screened for the virus, and initially admission was limited to contractors who performed essential services. *Id.* The BOP also conducts enhanced health screenings for staff in areas of "sustained community transmission." *Id.* The BOP screens all new inmates for virus "exposure risk factors and symptoms." *Id.* Any new inmate who is asymptomatic but has had a risk of exposure is quarantined. *Id.* According to the Government, the quarantine period is for a minimum of fourteen days or until cleared by medical staff. Opp. at 5. The Government indicates

5

that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff. *Id.* The Government also states that the BOP has taken the following steps to prevent the spread of the virus: group gatherings are limited to permit social distancing as much as possible, all staff and inmates have been issued face masks, and all staff and inmates are strongly encouraged to wear face masks when social distancing cannot be achieved. *Id.*

As of November 10, 2020, the BOP COVID-19 statistics are as follows: (1) currently, 2,455 inmates and 981 staff have confirmed positive tests; (2) 17,067 inmates and 1,543 staff have recovered; and (3) 135 inmates and 2 staff have died. *COVID-19 Cases*, Bureau of Prisons (Nov. 10, 2020), https://www.bop.gov/coronavirus/index.jsp. FCI Schuylkill – where Defendant is housed – has fortunately fared better. When Ware made his initial motion, FCI Schuylkill did not have any reported cases. As of November 11, 2020, FCI Schuylkill has 4 positive cases among staff, as well as 1 inmate and 1 staff member who have recovered. *Id.*

### 2. New Jersey

New Jersey has been particularly hard hit by the pandemic. New Jersey has taken numerous affirmative steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus. In addition, New Jersey initially closed schools indefinitely and closed beaches, state parks, and county parks. When the number of New Jersey cases started to decline, many of the initial restrictions were lifted or relaxed. However, New Jersey is now facing another uptick in positive cases, and the Governor recently issued new mitigation orders. *Governor Murphy Announces New COVID-19 Mitigation Measures*, New Jersey COVID Information Hub (Nov. 11, 2020), https://covid19.nj.gov/faqs/announcements/all-announcements/governor-murphy-announces-new-covid-19-mitigation-measures. As of November 11, 2020, New Jersey

has 263,495 cases and a resulting 14,676 deaths. *Data Dashboard*, New Jersey COVID Information Hub (Nov. 12, 2020), https://covid19.nj.gov. Essex County, where Defendant indicates he would live if released, has had 28,451 cases with 1,931 deaths, including 360 new cases. *Id.*

### C. Ware's Other Relevant Background, Activities, and Conditions

Defendant is 51 years old. He suffers from hypertension and obesity; he also has asthma. The Government does not contest these medical conditions but notes that Ware's prison medical records show that he has received adequate medical care. The Government adds that Ware has never been denied medical treatment for his asthma and his latest blood pressure reading was within normal limits.

Ware had a difficult childhood. He had no relationship with his father, and his mother was addicted to crack cocaine and alcohol. PSR ¶¶ 201-202. When Ware was about nine years old, he was removed from his mother's home for some time because she was unable to care for him. *Id.* ¶ 202. Ware never experienced a stable home environment until he was about twelve, at which time both his grandmother and his aunt took care of him. *Id.* ¶ 203.

Beside the current criminal matter, Ware has an extensive criminal history. At age 16, Ware was convicted of aggravated assault and unlawful possession of a weapon; he was sentenced to 8 years in prison. *Id.* ¶ 176. He was paroled on March 8, 1991 (but later violated his parole and served his maximum sentence) and sold cocaine a few months later. *Id.* ¶ 178. Shortly thereafter, on July 26, 1991, Ware was arrested for holding two men at gunpoint and ultimately convicted of unlawful possession of a handgun and possession of a weapon for an unlawful purpose. *Id.* ¶ 181. Around the same time, he committed anther gun crime and was sentenced for aggravated assault and unlawful possession of a weapon. *Id.* ¶ 184. In 2004, he fired a gun at a police officer and

was convicted of aggravated assault on a police officer and unlawful possession of a handgun. *Id.* ¶ 187. While incarcerated for those offenses, Ware had 40 infractions, including setting a fire and assault. *Id.* ¶ 189. Shortly after his release in January 2009, Defendant was arrested for robbing a pharmacy and convicted of theft by unlawful taking. *Id.* ¶ 190.

During his current incarceration, Ware has completed several classes to improve his vocational skills and to modify any improper behavior. D.E. 37-1 at 1-15. In addition, Defendant's latest letters, D.E. 43, 44, indicate that his mother recently had a stroke. Ware asks that the Court also consider releasing him so that he can care for his mother. *Id.* Ware notes that his younger brother's employment prevents his brother from caring for their mother. *Id.* Ware also indicates that his other brother is homeless and cannot care for their mother. *Id.*

On May 4, 2020, Ware wrote to the Warden of FCI Schuylkill, seeking his release for the same reasons he raises now. Ware then filed his *pro se* motion on May 6, 2020, before receiving a response and before his was permitted to by statute. On May 18, 2020, the Warden denied Defendant's request. *Id.* at 20-21.

## II. LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after

> considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) *extraordinary and compelling reasons warrant such a reduction*; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;
>
> *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and
>
> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and
>
> (2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added). The parties agree that Defendant has satisfied the statutory exhaustion requirement. Opp. at 4.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13. U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The application notes to the section provide four circumstances that can be considered extraordinary and compelling: (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons. *Id.* cmt. n. 1(A)-(D).

9

In the application note, the fourth consideration requires a determination by the Director of the BOP. *Id.* cmt. n. 1(D). Here, the Government does not contest that the policy statement should also apply when the motion is filed by a defendant, in addition to a motion filed by the BOP Director. The Court also finds that the policy statement applies here, although this has been a point of contention in similar cases. In *United States v. Rodriguez*, 451 F. Supp. 3d 392, (E.D. Pa. 2020), United States District Judge Anita Brody confronted the same issue. Ultimately, Judge Brody held that the fourth provision also applies when the motion is made by a defendant. *Id.* at 400. Judge Brody noted that her determination was in accord with the majority view. *Id.* at 397 (collecting cases). Judge Brody also persuasively explained her decision as follows:

> Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.
>
> It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. . . . This would have the perverse effect of *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.
>
> That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate

> release applications."). . . . Congress sought to help, not hinder, these sorts of prisoners . . . . Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.
>
> Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling." Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill. Nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute's text directly instructs *courts* to "find that" extraordinary circumstances exist.

*Id.* at 399-400 (emphases in original).

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a). They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant. *Id.*

### III. ANALYSIS

Ware indicates that, in light of the pandemic, he should be released because of his medical conditions. Br. at 1-3; Supp. Br. at 2, 3, 4-9. Ware also notes that while incarcerated, he has taken classes to improve his chances upon release (both as to vocational skills and as to behavior/conduct), he has maintained contact with his family, and he has aided an author in publishing a book. D.E. 37-1 at 1-15; Reply at 2. Defendant acknowledges that while FCI Schuylkill has not had many positive cases, this statistic is undercut by BOP's inadequate testing regimen, among other deficiencies. Supp. Br. at 9-14. Defendant indicates that if released, he would reside in Newark with his mother. *Id.* at 16. Defendant also asks that he be released to care

for his mother, who recently suffered a stroke. D.E. 43, 44. In opposition, the Government admits that Ware's medical conditions put him within a more vulnerable population should he contract COVID-19 but notes that FCI-Schuylkill has taken successful measures to combat the virus. Opp. at 19-22. More importantly, according to the Government, Ware's criminal history and his actions in the current case countenance against release. *Id.* at 14-19.

The Court finds that Ware has not met his burden in demonstrating extraordinary and compelling reasons to justify his release. The Court also finds that Ware has failed to show that he will not be a danger to the community or another person if released.

Turning first to Ware's arguments concerning the pandemic, his obesity puts him in a more vulnerable category. Ware's asthma and hypertension also potentially makes him more at risk of suffering an adverse outcome should he contract the virus. These factors weigh in favor of Defendant's request.

However, the Court finds that Defendant has not met his burden as to extraordinary and compelling circumstance because FCI Schuylkill has not suffered any serious outbreak of positive cases. This fact is critical. When Defendant first filed his motion, the facility did not have any cases. Since then, there have been a total of four cases, with three of them involving staff. One of the staff members, as well as the lone inmate who tested positive, have recovered. Statistically, FCI Schuylkill is much safer for Defendant than Essex County, where he wishes to be released.

Ware, among things, attacks the testing methods of the BOP. This may be a fair criticism. But Ware has not presented any evidence that the number of reported cases at FCI Schuylkill is inaccurate. Thus, it appears that the BOP's efforts, at least in regard to FCI Schuylkill, are currently working. Ware also does not challenge the Government's information that staff, contractors, and new inmates are screened for the virus before entering. Once a facility is confident

that its inmate population does not have the virus, it appears that preventing any positive cases from entering the facility – through screening – is crucial.

However, even if Ware had demonstrated extraordinary and compelling circumstances, the Court would nevertheless deny his motion because of the real risk of danger to others. Ware was sentenced to fifteen years imprisonment, which is a lengthy sentence. Yet, his conduct in this case justified the sentence. He went on a criminal rampage, committing armed robbery at four pharmacies and also carjacking a taxi driver at gunpoint. He and his accomplice(s) not only drew their weapons, but also expressly threatened to kill anyone who did not obey their commands while physically abusing certain victims. Ware's actions were extraordinarily dangerous and terrifying.

Moreover, Ware's criminal history reflects a litany of violent crimes, most often involving a firearm. He has committed aggravated assault, and he has fired a weapon at a police officer. His criminal record further reveals that he often committed very serious crimes soon after his release. And, when he was previously incarcerated, his disciplinary record was egregious, including assault and setting a fire. Based on the circumstances of Ware's current case and his past offenses, the Court is left with the firm conviction that if Ware is released, he will again commit serious crimes – most likely with a firearm.

For the foregoing reasons, the Court denies Ware's motion.

**IV.  CONCLUSION**

For the foregoing reasons, the Court denies Defendant's motion. An appropriate Order accompanies this Opinion.

                                            John Michael Vazquez, U.S.D.J.